NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0876n.06

No. 11-3857

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Oct 08, 2013
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| EIRIK TILLMAN, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | NORTHERN DISTRICT OF OHIO |
| OHIO BELL TELEPHONE COMPANY, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

Before: COLE and COOK, Circuit Judges; and ROSEN, Chief District Judge.[*]

PER CURIAM. Plaintiff-Appellant Eirik Tillman is a former employee of Defendant-Appellee Ohio Bell Telephone Company ("Ohio Bell"). In 2006, Tillman was diagnosed with lumbar degenerative disease, a chronic back condition. With the condition allegedly causing him exacerbated pain two to three days a month, Tillman requested, and was granted, intermittent leave pursuant to the Family Medical Leave Act (the "FMLA") for use whenever his back pain flared up or when he had doctor's appointments for treatment of his condition. Ohio Bell, however, began noticing suspicious patterns in the timing of Tillman's requests for FMLA leave and initiated an investigation. The investigation led to the company's determination that Tillman was abusing his FMLA leave, and he was ultimately terminated from his position.

---

[*]The Honorable Gerald E. Rosen, Chief Judge of the United States District Court for the Eastern District of Michigan, sitting by designation.

Thereafter, Tillman filed an action in the United States District Court for the Northern District of Ohio alleging that Ohio Bell violated the FMLA "by interfering with, restraining or denying [him] the exercise of rights provided under the FMLA and/or retaliating against [him] by discharging him for asserting or otherwise exercising his rights under the FMLA." (Compl. ¶ 20.) The district court entered summary judgment in favor of Ohio Bell on both the interference and retaliation claims. Tillman now appeals the grant of summary judgment. For the reasons stated below, we AFFIRM the district court's decision.

## I. FACTUAL BACKGROUND

Eirik Tillman began working for Ohio Bell Telephone Company as a Communications Technician in November 2000. (R. 50, Tillman Dep. at 27.) In 2004, he was promoted to the position of Telecommunications Specialist ("TCS"). Like his original Communications Technician job, the TCS position was a union position, subject to the terms of a Collective Bargaining Agreement ("CBA") between the company and the Communications Workers of America. (*Id.* at 30 31.)

Pursuant to the CBA, Telecommunications Specialists select their work shifts by seniority. As a low seniority TCS, Tillman was often required to work the less desirable evening, night and weekend shifts. His position entailed provisioning work, which involved technical work to fill customer orders for telephone and internet service, as well as maintenance work. (R. 44, Fuentes Dep. at16 17.) The maintenance work consisted of investigating customer problems to determine

whether the source of the problem was Ohio Bell's internal systems or equipment, as opposed to external equipment or connections at the customer's site.

The TCS job description lists lifting up to 100 pounds and climbing ladders as physical requirements of the position. (R. 45, Boyer Dep. at 25.) However, Tillman's supervisors testified that technicians did not climb ladders on a daily basis, (R. 44, Fuentes Dep. at 20 21; R. 45, Boyer Dep. at 25), and rarely had to lift more than 15 pounds (R. 44, Fuentes Dep. at 20). Driving was also a routine function of the position.

**Tillman's Back Condition**

In 2006, Tillman began suffering from severe back pain. (Compl. ¶ 10.) He was diagnosed with lumbar degenerative disk disease, a chronic back condition. (R. 51, Hoffman Dep. at 38, 75.) For this condition, Tillman treated with his family physician, Dr. Elizabeth Hoffman. According to Dr. Hoffman, as a result of this condition, Tillman experiences exacerbated pain two to three days a month. (*Id.* at 76.) Dr. Hoffman explained that on these days, the pain impairs Tillman's "ability to lift, to carry heavy objects, to bend repeatedly, or actually bend at the waist." (*Id.* at 78.) Dr. Hoffman testified that during these periods of pain an individual with Tillman's condition would be expected to enter and exit a car "very carefully," and would struggle to lift objects off the ground unless he was "bending at the knees and not at the waist." (*Id.* at 71, 81.) Dr. Hoffman further testified that Tillman told her that when experiencing a period of severe period pain, he "had trouble walking for more than five or ten minutes at a time" without sitting down, and that he was only able

to drive for short periods of time (no more than an hour). (*Id*. at 78.) The doctor further stated that Tillman was unable to predict in advance when he would have one of these periods of pain exacerbation.

Dr. Hoffman recommended various treatments for Tillman's back condition, including prescription medication, physical therapy, weight loss, and avoiding exacerbating factors like heavy lifting. The medications that Dr. Hoffman prescribed to Tillman for his back condition, however, did not impair his ability to drive or work, nor cause any adverse side effects. (*Id*. at 23  25, 63, 71.)

As for physical therapy, Tillman only attended two physical therapy sessions at Total Rehab of Bedford, the rehabilitation facility to which Dr. Hoffman referred him, and he was discharged from Total Rehab in June of 2008. (*Id.* at 72  73.) Home exercises were recommended to Tillman following his discharge from Total Rehab. These home exercises did not involve any type of pre-scheduled appointments with physical therapists, nor was it medically necessary for Tillman to take time off from work to do them. (*Id.* at 39, 72  74.) Dr. Hoffman further testified that there was no need for anyone else to be at home when Tillman performed his home therapy, adding that having someone else with him was neither medically necessary nor necessary for his safety. (*Id*. at 73  74.)

Although Dr. Hoffman indicated it was possible that the home exercises could cause exacerbated pain, she testified that Tillman never told her that the home exercises exacerbated his pain. (*Id.* at 106.) In fact, she testified that when she saw Tillman in May of 2009, he indicated that he was doing exercises at home and "feels better." (*Id*. at 33.) Further, the FMLA certifications that

4

Dr. Hoffman completed for Tillman in 2008 and 2009 did not indicate a need for leave due to pain or incapacity while recovering from home exercises or any other type of treatments for his back condition. Indeed, Dr. Hoffman affirmatively indicated on the certification forms that the treatments she recommended for Tillman (prescription medications and physical therapy) would not lead to periods of incapacity. (*Id.* at 83 91; *see also* R. 50, Tillman Dep. Exs. I K.)

**Tillman's Use of FMLA Leave**

In December of 2006, Tillman began requesting and receiving fully-paid intermittent FMLA leave for his back condition. (R. 32, Ex. G, Affidavit of Mary Glass ¶ 11.) These intermittent FMLA leave requests/grants continued for the next three years. In 2007, Tillman was granted paid intermittent FMLA leave for his back condition for two to six days per month in January, February, March, April, October, November and December. (*Id*. ¶¶ 11 22.) During October, November, and December of 2007, his FMLA days routinely fell on Fridays and weekends, resulting in him having three-day or four-day weekends for at least one weekend in October, three weekends during November and another three weekends in December, including the weekend preceding the New Year's holiday. (*Id*. ¶¶ 12 22.)

In 2008, Tillman was on short-term disability for approximately two and a half weeks in February for nasal adhesions, which also counted as FMLA leave time. (*Id.* ¶ 23.) Then, in May of 2008, Tillman again sought paid intermittent FMLA leave relating to his back condition. (*Id*. ¶ 24.)

With the exception of August and September of 2008, Plaintiff requested three days of paid FMLA leave every month from May of 2008 until April of 2009. (*Id*. ¶¶ 24  39.)

The fully paid FMLA leave days that Tillman requested throughout 2008 also regularly fell on Fridays and/or weekends and were frequently adjacent to already-scheduled days off or holidays, which extended his time off from work and often provided him with three-day and four-day weekends. For example, Tillman took June 12 through 14 (Thursday through Saturday) off due to FMLA reasons when he was already scheduled off for Sunday and Monday June 15 and 16th. (*Id*. ¶ 25.) In July, he took an FMLA day on Saturday, July 12, which was followed by two scheduled days off on Sunday and Monday, July 13 and 14. (*Id*. ¶ 26.) In August, one of Tillman's FMLA days fell on Friday, August 8, and was followed by nine scheduled days off. (*Id*. ¶ 29.) Similar patterns occurred in October and December. (*Id*. ¶¶ 30, 33.) Tillman also took FMLA leave on December 31 and January 1, 2, and 3, resulting in four consecutive days off over the New Year's holiday for a second year in a row. (*Id*. ¶¶ 35  36.[1])

Even though Dr. Hoffman testified that Tillman could not predict when he was going to have a flare up of his back pain, Tillman often notified his supervisor in advance that he intended to use FMLA leave time on a future date. For example, on December 12, 2007, Tillman e-mailed his

---

[1]In his reply brief, Tillman argues for the first time that it was logical for his FMLA days to routinely fall on the weekends because his work week typically lasted from Thursday until the following Monday. (Appellant's Reply Br. at 5.) To support this proposition, Tillman cites to a portion of Boyer's deposition where Boyer testified that Tillman preferred to have Mondays and Tuesdays off, as opposed to Tuesdays and Wednesdays. (R. 45, Boyer Dep. at 101.) Boyer, however also testified that employees do not have set schedules and that "[schedules] may change [every week] depending on the needs of the business." (*Id.* at 29.)

supervisor, Antone Boyer, to tell him he would be on FMLA December 14 through 16, 2007. (R. 32, Ex. A, Tillman Dep. at 113 & Dep. Ex. Q.) The very next day, Tillman advised the same supervisor he would also be "off" several days in the coming weeks, including December 21 through 23, 2007 and December 29, 2007, "due to FMLA." (*Id*. at 113 14 & Dep. Ex. R.) Similarly, on June 27, 2008, Tillman e-mailed his supervisor to tell him that he would be taking FMLA leave "due to my therapy" on July 12, 19, and 26 three of the four Saturdays falling in that month. (*Id*. at 118-19 & Dep. Ex. X.)

On July 23, 2008, Tillman advised his supervisor over a week in advance that he would be using a FMLA day on Saturday, August 2. (*Id*. at 121 & Dep. Ex. Z.) On December 1, 2008, Tillman sent an e-mail to his supervisor Tony Fuentes stating, "If I end up on evenings due to seniority, I'm letting you knowing [sic] in advance I will be using a FMLA day on Dec. 13." (*Id*. at 121 23 & Dep. Ex. AA.) Tillman sent another e-mail to Fuentes on December 17, 2008, advising Fuentes two weeks in advance that he planned to use FMLA leave around the New Year's holiday, on December 31, January 2, and January 3. (*Id*. at 123 24 & Dep. Ex. BB.)

**Investigation into Tillman's Use of FMLA Leave**

Tillman's co-workers and supervisors began noticing these patterns in Tillman's FMLA leave (i.e., Saturdays, extended weekends and vacations and "forecasting" his incapacity in advance) and complained to Area Manager Ann Taylor about Tillman's absences and suspicious use of FMLA leave. (R. 52, Taylor Dep. at 31 46.) Taylor asked the supervisors to provide her with information

substantiating the complaints. (*Id*. at 32, 43.) After reviewing the information provided by the supervisors, Taylor observed for herself the patterns in Tillman's FMLA leave, and suspected that misuse of FMLA time was occurring. (*Id*. at 47.)

On November 5, 2008, Taylor took the issue to Human Resources. The Human Resources representative recommended that she submit an RFI (Request for Investigation) to the FMLA Department. (*Id*. at 46 47, 52 53, 59.) The RFI was submitted to Mary Glass, FMLA Manager/Asset Protection Liaison. (R. 32, Ex. H, Glass Dep. at 45 46.) Glass is responsible for reviewing all Requests for Investigation into FMLA leave abuse within the AT&T family of companies, which included Ohio Bell. (R. 32, Ex. G, Glass Aff. ¶ 2.) Glass believed Tillman's FMLA use was suspicious based on his forecasting of FMLA absences in advance and the patterns of adding FMLA leave to his already-scheduled days off to extend his periods of time off work. On or about December 23, 2008, after Glass was provided with additional information that further substantiated Tillman's practice of predicting his FMLA absences and after she learned that Tillman's assigned shift might be changing to days (making it easier to observe and verify his activities that it would have been when he was working a night shift), she approved the Request for Investigation of Tillman's use of FMLA leave (R. 32, Ex. H, Glass Dep. at 53 54, 58 59), and then turned the matter over to the company's Asset Protection Department to conduct the investigation (*id*. at 61).

Tillman's case was assigned to Investigator Patrick McCreary. (R. 32, Ex. D, McCreary Dep. at 57 58.) McCreary asked that Taylor forward him any information regarding days that Tillman

8

called off for FMLA. (R. 52, Taylor Dep. at 62.) McCreary thereafter hired an outside private investigation company to conduct surveillance of Tillman on the days and during the work hours that Tillman requested off as FMLA leave. (R. 32, Ex. D, McCreary Dep. at 45, 62.)

**Surveillance**

On Sunday, March 15, 2009, Tillman was observed working in his yard and in his garage for approximately two hours. (*Id*. at 70 79 & Dep. Ex. 9.) On Saturday, March 28, 2009, Tillman was observed driving his family around for approximately two hours, conducting a number of personal errands such as stopping for coffee and visiting a sporting goods store, a department store, and a dental office, exiting and entering his car at each stop. Upon returning home, Tillman was observed working in his garage for about an hour during which time he was observed repeatedly bending down and lifting pieces of wood trim and carrying them into his house. (*Id*. at 70 79 & Dep. Exs. 9, 14.) He was observed making at least seven trips back and forth between his garage and his house. All of these activities were captured on video. (*Id*. at 79.[2])

---

[2]Tillman argues that he could not have been seen working in his yard for two hours because "the surveillance tape itself is only forty six minutes and forty seven seconds." (Appellant's Br. at 8.) However, as Patrick McCreary testified, in his experience, private investigators typically do not run videotape for the entire time of the surveillance. (R. 32, Ex. D, McCreary Dep. at 114 16.) Furthermore, the written log from the surveillance reveals that Tillman was observed by the private investigators doing work in his garage and in his yard for two hours beginning at 11:01 a.m. (*See* R. 43, Investigative Services Report at 4.)

**Medical Review**

On April 3, 2009, at Glass's direction, McCreary provided the surveillance report and the DVD compilation of the surveillance video to Dr. Shirley Conibear, M.D., an outside medical consultant retained by AT&T, for review. (R. 32, Ex. D, McCreary Dep. at 46 47; Ex. H, Glass Dep. at 35-62.) Dr. Conibear issued a report on April 10, 2009. (R. 32, Ex. L, Conibear Dep. at 36 & Dep. Ex. 14; Ex. D, McCreary Dep. at 120 & Dep. Ex. 14; Ex. H, Glass Dep. at 67 & Dep. Ex. 14.) In preparing her report, Dr. Conibear reviewed two FMLA Certification forms signed by Dr. Hoffman, one of which was faxed to the company on February 10, 2009 and the other on March 10, 2009; the job description for the Telecommunications Specialist position; and the private investigator's surveillance DVD and written surveillance log. (R. 32, Ex. L, Conibear Dep. at 36.)

Dr. Conibear's report included an analysis of what she observed on the surveillance DVD of Tillman's activities on March 15 and 28, 2009. Dr. Conibear stated that she observed that Tillman "bent at the waist and stood again without any sign of pain, stiffness, or weakness," was able to "reach[] above his head and t[ake] objects down [from above]," could "carr[y] objects outside the garage, and place[] them on the ground, and move[] objects from one location to another with one hand." (R. 32, Ex. L, Conibear Dep. Ex. 14,Conibear Report at 2.) She also saw that Tillman was able to "squat[] or kneel[]" and then "st[and] erect again without hesitation." (*Id.*) She further noted that Tillman "walked and stood without any sign of stiffness, weakness or pain," and that "[h]is actions were brisk and without hesitation." (*Id.*) He could "enter and exit from his vehicle without using his hands to support or brace his body" and "[h]e twisted with his hand behind his back to

close the door as he walked away." (*Id.*) Dr. Conibear further observed that Tillman "did not limp or favor a leg when walking," and "[h]is gait was smooth, easy, and symmetric with normal arm swing." (*Id.*) She also observed that "[h]e did not splint his back with his arm or hand" and there was "no indication that he was in pain" either "in his movements [or] his facial expressions." (*Id.*)

Based on her observations, Dr. Conibear concluded that, in her professional opinion, Tillman's activities on March 15 and March 28, 2009 were inconsistent with the physical behaviors typical of someone with incapacitating back pain and that he was not incapacitated, as defined by the FMLA, from performing his work duties as a Telecommunications Specialist on those dates. (*Id.* at 3.)

**Tillman's Interview with Investigator McCreary**

On April 16, 2009, Patrick McCreary met with Tillman and interviewed him regarding his FMLA usage. (R. 32, Ex. D, McCreary Dep. at 81 96 & Dep. Ex. H.) According to McCreary, during the interview, Tillman indicated that he used FMLA on weekends for convenience because he did not have time to do his home exercises during the week while he was "too busy" with other activities, such as "driving people around." (*Id.*[3]) When asked if he could recall his activities on March 15 or March 28, Tillman could not specifically recall but he suggested that he may have been

---

[3]McCreary further testified that Tillman acknowledged that he was not incapacitated every time he took FMLA leave, but sometimes he "just need[ed] a break." (R. 43, McCreary Dep. at 96 & R. 44, Dep. Exs.10 12.) Tillman denied telling McCreary that he sometimes just needed a break, but he did not deny making the statement about being too busy "driving people around" during the week. (*See* R. 50, Tillman Dep. 91 95.)

able to engage in some of the physical activities he did because "maybe" his doctor had given him a shot of Cortisone earlier in the day. (*Id.*) Tillman also stated that he may have been under the influence of Oxycodone or Percocet and, therefore, would not have been suited to operate a company vehicle. (*Id.*[4])

At the end of the interview, and in Mr. Tillman's presence, McCreary typed up a Statement based on the interview and gave it to Tillman for his and his Union representative's review, and asked Tillman to make any necessary corrections and to sign it. (*Id.* at 92 96.) Although Tillman did not ask to make any changes in the Statement and did not indicate to Mr. McCreary that anything in the Statement was inaccurate, he refused to sign it. (*Id.*)

Following the interview, Tillman was suspended pending further investigation. (R. 52, Taylor Dep. at 90 91; R. 44, Fuentes Dep. at 57 58.)

**Denial of Tillman's March 15 and 28, 2009 FMLA Leave Requests and Termination**

As a result of the investigation, on April 17, 2009, Glass denied Tillman's request for FMLA leave time for his absences on March 15 and March 28. (R. 32, Ex. H, Glass Dep. at 64; R. 41 & 42, McCreary Dep. at 101.) Glass's decision to deny FMLA leave for these absences was based on the surveillance observations, Tillman's statements in Patrick McCreary's interview, Dr. Conibear's

---

[4]Tillman, however, made no attempt to explain how, if he were under the influence of a narcotic, he would have nonetheless spent two hours driving his family around in his own car. Furthermore, Dr. Hoffman testified that she did not give Tillman an injection of Cortisone, nor did she ever prescribe him Oxycodone or Percocet. (R. 51, Hoffman Dep. at 82.)

report, Tillman's e-mail to his supervisor indicating he would take FMLA leave on December 13 if he got assigned to the night shift, and the pattern of using FMLA days on weekends or combined with his days off and holidays to extend his time away from work. (R.32, Ex. H, Glass Dep. at 65 66.)

The findings of the investigation, including the denial of FMLA leave for the two dates in March, were subsequently reported to management. Area Manager Ann Taylor reviewed the Asset Protection Investigation Report and the surveillance tapes, and conferred with the vice president and director to whom she reported. Taylor also discussed the investigation results with Human Resources and Labor Relations staff. Based on their review of the investigation findings, including the denial of FMLA leave for March 15 and March 28, 2009, the decision was made that Tillman's employment should be terminated. (R. 52, Taylor Dep. at 92 95.)

Dismissal Review Board proceedings, required by the CBA, were conducted on May 11, 2009. (*See* R. 32, Ex. I, Affidavit of Bryan Redfern ¶ 4.) At the hearing, Labor Relations Manager Brian Redfern reviewed the AT&T Code of Business Conduct, which provides, in pertinent part:

> Fraudulent or illegal conduct committed on or off the job may be grounds for disciplinary action, up to and including dismissal.

> Fraudulent or illegal conduct includes, but is not limited to, any oral or written misrepresentation of facts, misappropriation of funds, theft, improper reporting of time or expenses, wrongfully claiming employee or dependent benefits, or any other dishonest acts, done on or off the job, and whether done while working for an SBC company or elsewhere, or prior to employment with SBC.

(*Id.* ¶ 5; R. 32, Ex. J, Responses to Plaintiff's 1st Set of Interrogatories at No. 6; Ex. A, Tillman Dep. at 35 37 & Dep. Ex. E at 9.[5]) Tillman was terminated pursuant to this provision. (R. 32, Ex. I, Redfern Aff. ¶ 5.)

Following the Dismissal Board hearing, the company upheld its original decision, and Tillman's employment was terminated, effective May 15, 2009. (*Id.* ¶ 6 & Ex. 1.) Tillman's Union declined to contest the matter through the arbitration process. (R. 50, Tillman Dep. at 101 102.)

## II. ANALYSIS

### A. STANDARD OF REVIEW

We review the district court's grant of summary judgment *de novo*, using the same standard of review applicable in the district court. *Gecewicz v. Henry Ford Macomb Hosp. Corp.*, 683 F.3d 316, 321 (6th Cir. 2012). Summary judgment is proper if, viewing the facts and drawing all inferences in the light most favorable to the nonmoving party, "'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Bruederle v. Louisville Metro Gov't*, 687 F.3d 771, 776 (6th Cir. 2012) (quoting Fed. R. Civ. P. 56(a)). "A genuine issue of material fact exists when there is sufficient evidence for a trier of fact to find for the non-moving party." *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). "A 'mere scintilla' of evidence, however, is not enough for the non-moving party to withstand

---

[5]The Code of Business Conduct is utilized by the all of the separate companies that are part of the family of companies under the "AT&T" brand name. (R. 32, Ex. I, Redfern Aff. ¶ 5.)

summary judgment." *La Quinta Corp. v. Heartland Props., LLC*, 603 F.3d 327, 335 (6th Cir. 2010) (citing *Ciminillo*, 434 F.3d at 464).

Further, in ruling on a district court's grant of summary judgment, an appellate court does not have to rely on the same reasons that persuaded the lower court. *See, e.g.*, *City Mgmt. Corp. v. U.S. Chem. Co.,* 43 F.3d 244, 251 (6th Cir. 1994) (explaining that an appellate court may affirm a decision of the district court if that decision is correct for any reason, including a reason not considered by the district court); *Herm v. Stafford*, 663 F.2d 669, 684 (6th Cir. 1981) ("An appellate court can find an alternative basis for concluding that a party is entitled to summary judgment and ignore any erroneous basis relied upon by the district court, provided [that] the opposing party is not denied an opportunity to respond to the new theory").

In this appeal, Plaintiff-Appellant Tillman contends that the district court erred in granting Defendant's motion for summary judgment on his FMLA retaliation claim by concluding that the "honest belief" rule protected Ohio Bell's termination decision. He also argues that the district court erred in finding that the "honest belief" rule also applied to his FMLA interference claim. The Court will address each of Plaintiff's arguments in turn.

**B.    THE DISTRICT COURT CORRECTLY APPLIED THE "HONEST BELIEF" RULE IN GRANTING SUMMARY JUDGMENT ON PLAINTIFF'S FMLA RETALIATION CLAIM**

The Family and Medical Leave Act of 1993, 29 U.S.C. § 2601*et seq*. (the "FMLA"), entitles eligible employees to a total of 12 weeks of leave per year for various reasons, including because of "a serious health condition that makes the employee unable to perform the functions" of his or her position.   29 U.S.C. § 2612(a)(1)(D).   When medically necessary, such leave may be taken intermittently or on a reduced leave schedule.  *Id.* § 2612(b)(1).  The Act further entitles an eligible employee who takes a leave under § 2612 for the intended purpose of the leave to be reinstated upon his return from leave to the position he held before the leave or to an equivalent position. *See id.* § 2614(a)(1).

This Court recognizes two distinct theories for recovery under the FMLA:   (1) the "entitlement" or "interference" theory arising under 29 U.S.C. § 2615(a)(1), and (2) the "retaliation" or "discrimination" theory arising under 29 U.S.C. § 2615(a)(2).  *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 282 (6th Cir. 2012).

To establish a *prima facie* case of FMLA retaliation, a plaintiff must show by a preponderance of the evidence that (1) he was engaged in an activity protected by the FMLA; (2) the employer knew that he was exercising his rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to him; and (4) there was a causal connection between the protected FMLA activity and the adverse employment

action. *Seeger*, 681 F.3d at 283; *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012). Where

a plaintiff relies on indirect evidence, we evaluate the claim under the *McDonnell Douglas*[6] burden-

shifting framework. *Seeger*, 681 F.3d at 283; *Donald*, 667 F.3d at 762; *Edgar v. JAC Prods., Inc.*,

443 F.3d 501, 508 (6th Cir. 2006). Thus, once a plaintiff offers sufficient indirect evidence to

support his *prima facie* FMLA claim, the burden of production shifts to the defendant to articulate

a legitimate, non-discriminatory reason for the employment decision. *McDonnell Douglas*, 411 U.S.

at 802; *Seeger*, 681 F.3d at 284. If the employer articulates a legitimate reason for its action, the

burden of production shifts back to the plaintiff to demonstrate pretext. *Seeger*, 681 F.3d at 285.

A plaintiff may show pretext by demonstrating that the proffered reason (1) had no basis in fact; (2)

did not actually motivate the action; or (3) was insufficient to warrant the action. *Id.*; *Smith v.*

*Chrysler Corp.*, 155 F.3d 799, 805-06 (6th Cir. 1998).

The district court began its analysis at step two of the *McDonnell Douglas* framework, the

employer's justification for the adverse act. In this case, Ohio Bell proffered a legitimate, non-

discriminatory reason for Tillman's termination: his abuse of FMLA leave and his corresponding

violation of the company's Code of Business Conduct. Tillman disputes that he abused his FMLA

leave, and, thus, Ohio Bell did not actually have cause to discharge him. This is essentially a "no

basis in fact" pretext claim.

However, as the district court properly recognized, the "honest belief" rule defeats this type

of pretext argument. "[A]s long as an employer has an honest belief in its proffered

---

[6]*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

nondiscriminatory reason," the employee cannot establish pretext simply because the reason is ultimately shown to be incorrect. *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001); *see also Smith*, 155 F.3d at 806 (6th Cir. 1998) ("[S]o long as the employer honestly believed in the proffered reason given for its employment action, the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless."). When the "honest belief" rule is invoked, to establish pretext, "the plaintiff must allege more than a dispute over the facts upon which his discharge was based. He must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 94 (6th Cir. 2001) (citing *Smith*, 155 F.3d at 806 07). Our cases have extended the "honest belief" rule to FMLA retaliation cases. *E.g.*, *Seeger*, 681 F.3d at 285 87; *Donald*, 667 F.3d at 763.

In determining whether Defendant had an "honest belief" in the proffered basis for discharge, we examine whether Ohio Bell has established a "reasonable reliance" on the particularized facts that were before it at the time the decision was made. *Abdulnour v. Campbell Soup Supply Co.*, 502 F.3d 496, 502 03 (6th Cir. 2007); *Braithwaite*, 258 F.3d at 494. Yet, in determining whether an employer reasonably relied on the particularized facts before it, we do not require that the decisional process used by the employer "be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Seeger*, 681 F.3d at 285 (quoting *Smith*, 155 F.3d at 807).

The district court correctly held that Ohio Bell held an honest belief that Tillman had abused his FMLA leave and violated the company Code of Business Conduct. In making the decision to discharge Tillman, Ohio Bell relied on the Asset Protection Investigation Report and the surveillance tapes of Tillman's activities on March 15 and 28, 2009; Tillman's statements in Patrick McCreary's interview; Dr. Conibear's report in which she concluded that the video-taped activities of Tillman on March 15 and 28 were inconsistent with the physical behaviors typical of someone with incapacitating back pain, and that he was not incapacitated from performing his work duties on those dates; Tillman's e-mail to his supervisor indicating he would take FMLA leave on December 13, 2008 if he got assigned to the night shift; and the pattern observed over a period of nearly two and a half years of Tillman's use of FMLA leave days on weekends or combined with his days off and holidays to extend his time away from work.

Tillman does not deny that he engaged in the activities the private investigator observed and videotaped on March 15 and 28, 2009. He nonetheless argues that the district court erred in concluding that Ohio Bell had an honest belief that his actions were inconsistent with the back condition for which he had been granted intermittent FMLA leave. He also argues that his case is analogous to *Weimer v. Honda of America Manufacturing, Inc.*, No. 2:06-cv-844, 2008 WL 2421648 (S.D. Ohio June 12, 2008), in which the district court denied the parties' cross-motions for summary judgment finding that

19

a material issue of fact existed as to whether the plaintiff's employer honestly believed that the plaintiff exceeded the scope of his leave. Yet, contrary to Plaintiff's assertion, the *Weimer* court did not deny summary judgment simply because it concluded that "what functions of a job are 'essential' is a factual dispute." (Appellant's Br. at 17.) Rather, summary judgment was denied because "[t]he parties ... failed to present sufficient evidence of what tasks and demands constituted Plaintiff's job with Defendant. Absent this information, the Court cannot say whether the work Plaintiff apparently performed on his porch demonstrated that he could perform the essential tasks of his job." 2008 WL 2421648, at *5. There is no insufficiency of such evidence in this case.

Tillman also does not deny that he frequently exercised his FMLA leave time on weekends or adjacent to scheduled days off or that he "forecasted" his leave days in advance. He argues that he did so because his supervisor, Antone Boyer, asked for advance notice. However, Boyer testified that he asked employees to provide him with advance notice "if possible," and Plaintiff's own treating physician testified that Tillman was unable to predict in advance when he would experience an exacerbation of his back pain.

Finally, it was entirely proper for Ohio Bell to also consider the report of Dr. Conibear in forming its honest belief. Dr. Conibear reviewed the DVD and log of the surveillance of Tillman on March 15 and 28, 2009, the job description for Tillman's

20

Telecommunications Specialist position, and Dr. Hoffman's 2009 FMLA certifications. As indicated in her report, she observed in the surveillance DVD that Tillman bent at the waist and stood again without any sign of pain, stiffness, or weakness, made several trips in and out of the garage carrying large objects and was able to squat or kneel and then "st[and] erect again without hesitation." She further noted that Tillman walked briskly and fluidly without any sign of pain or weakness, and that he was able to enter and exit from his car with ease and without having to support or brace his body. Based on her observations, Dr. Conibear concluded that, in her professional opinion, Tillman's activities on March 15 and 28, 2009 were inconsistent with how someone with incapacitating back pain would act.

Tillman does not challenge Dr. Conibear's medical expertise. Rather, he argues that she should have discussed the matter with his personal physician and should have inquired about the specific weight of the objects she observed him carrying in the video before rendering her opinion. Yet, as indicated above, we do not require that an investigation "be optimal or that it left no stone unturned." *Seeger*, 681 F.3d at 285 (citation omitted).

In sum, we find that the record reflects that Ohio Bell made a reasonably informed and considered decision based upon the particularized facts before it at the time. We, therefore, conclude that the district court did not err in granting Defendant's motion for

summary judgment on Plaintiff's FMLA retaliation claim by concluding that the "honest belief" rule protected Ohio Bell's termination decision.

**C.    SUMMARY JUDGMENT WAS ALSO PROPERLY ENTERED ON PLAINTIFF'S FMLA INTERFERENCE CLAIM**

The district court's use of the "honest belief" rule in denying Tillman's interference claim, however, presents a more difficult issue because of conflicting authority in our Circuit. We begin with the statutory language and settled interference-claim principles.

The interference provision of the FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise any right provided in [the Act]." 29 U.S.C. § 2615(a)(1). Also known as an FMLA "entitlement" claim, the employer violates the act if it interferes with an FMLA-created right to medical leave or reinstatement after a qualified leave. *Arban v. West Publ'g Corp.*, 345 F.3d 390, 400  01 (6th Cir. 2003). Though our cases recognize some overlap between the interference and retaliation theories, *see Weimer v. Honda of Am. Mfg., Inc.*, 356 F. App'x 812, 815 (6th Cir. 2009) (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir.2001)), "the requisite proofs differ," *Seeger*, 681 F.3d at 282. A prima facie case of FMLA interference requires the plaintiff to show that (1) he is an eligible employee; (2) the defendant is an employer as defined in the Act; (3) he was entitled to leave under the FMLA;

(4) he gave the defendant notice of his intention to take leave; and (5) the defendant denied him FMLA benefits to which he was entitled. *Donald*, 667 F.3d at 761 (citations omitted). As with retaliation claims, the *McDonnell Douglas* framework applies, meaning that the employer must respond to the prima facie case with evidence that "it had a legitimate reason unrelated to the exercise of FMLA rights for terminating the employee," whereupon the plaintiff must show pretext. *Id.* at 762. No one disputes these basic principles, yet they leave unanswered today's question: does an employer's honest belief that the employee abused FMLA benefits defeat the employee's claim to those benefits.

The "honest belief" defense fits neatly into the retaliation context, where the legal standard inherently demands an employer's culpable mental state     i.e., that the employee's exercise of FMLA rights *caused* the employer to *discriminate* against the employee. 29 U.S.C. § 2615(a)(2) ("It shall be unlawful for any employer to discharge or in any other manner *discriminate* against any individual *for* opposing any practice made unlawful by this subchapter." (emphasis added)); *Donald*, 667 F.3d at 761. Absent pretext, an employer's honest belief of FMLA abuse defeats causation; the employer did not retaliate against the employee for exercising FMLA rights, but punished the employee for perceived misconduct. By its terms, however, the interference claim lacks this inherent *scienter* requirement; it simply prohibits "interfer[ing] with, restrain[ing], or deny[ing] the exercise of [FMLA rights]." 29 U.S.C. § 2615(a)(1). An employer who honestly, but mistakenly believes that

23

the employee abused his FMLA leave can still be said to have interfered with, restrained, and/or denied the exercise of those rights.

Our recent decision in *Seeger* explored the contours of these different FMLA claims.

The interference theory has its roots in the FMLA's creation of substantive rights, and "[i]f an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred," regardless of the intent of the employer. The central issue raised by the retaliation theory, on the other hand, is "whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason." In contrast to the interference theory, "[t]he employer's motive is relevant because retaliation claims impose liability on employers that act against employees specifically because those employees invoked their FMLA rights."

681 F.3d at 282 (citations omitted). Acknowledging these differences, our interference-claim precedents repeatedly disclaim consideration of the employer's intent. *Id.*; *Edgar*, 443 F.3d at 508 ("The employer's intent is not a relevant part of the [interference] inquiry under [the FMLA]."); *Arban*, 345 F.3d at 401 ("Because the issue is the right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer." (quoting *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir.1998))). Other circuits echo this principle. *See, e.g.*, *Sanders v. City of Newport*, 657 F.3d 772, 779 (9th Cir. 2011); *Colburn v. Parker Hannifin/Nichols Portland Div.*, 429 F.3d 325, 332 (1st Cir. 2005); *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 960

(10th Cir. 2002); *King v. Preferred Technical Grp.*, 166 F.3d 887, 891 (7th Cir. 1999).[7]

Though *Edgar* and *Arban* do not address claims of FMLA abuse,[8] they caution against applying this sort of "honest belief" rule to interference claims.

Nevertheless, two of our unpublished cases sanction the "honest belief" defense in cases involving interference claims. These decisions rejected challenges to jury instructions including the defense. *Adams v. Auto Rail Logistics, Inc.*, 504 F. App'x 453, 457 58 (6th Cir. 2012) (reasoning that the employer "need only demonstrate that it believed that the plaintiff was misusing the FMLA such that it would have discharged the plaintiff despite any legitimate FMLA leave"); *Weimer*, 356 F. App'x at 819 (sustaining instruction that permitted the jury to decide whether, in firing the employee who requested FMLA leave, the employer honestly believed the plaintiff misrepresented his need for leave). Neither decision offers much guidance for this case. *Adams* did not attempt to square its holding with our precedents precluding consideration of the employer's intent, and the alleged leave abuse consisted of the employee's reliance on the employer's instruction not to return to work until

---

[7]*Edgar* tempered its denouncement of employer intent for interference claims by noting that "the FMLA is not a strict-liability statute," 443 F.3d at 507, but, far from endorsing an employer-intent standard, the court acknowledged a prejudice requirement, explaining that "[e]mployees seeking relief under the entitlement theory must . . . establish that the employer's violation caused them harm," *id.* at 508.

[8]*Seeger*, on the other hand, did involve allegations of disability fraud, but the court construed the plaintiff's claim as a retaliation claim because he "received all of the FMLA leave to which he was entitled." 681 F.3d at 283. The court then applied the "honest belief" rule in affirming the district court's grant of summary judgment to the employer. *Id.* at 285 87.

he submitted a medical certification, not the employee's fraudulent leave request. *Adams*, 504 F. App'x at 454 55 (noting that the employee admitted he did not need the leave to care for his sick daughter after the first day, but that he stayed home because of the supervisor's instructions). *Weimer*, meanwhile, bears a closer resemblance to the "honest belief" defense advanced in this case, in that the employer presented surveillance evidence that the employee misrepresented his medical condition to obtain leave. 356 F. App'x at 819. Still, the court cautioned that its approval of the "honest belief" instruction did not permit the employer "to escape liability if [the employee] had a serious health condition, but the employer harbored an 'honestly held belief' that he did not have a serious health condition." *Id.* (explaining that the instruction "properly directed [the jury] to focus on whether causation was or was not established"). The conflicting signals in that decision likely reflect the panel's view that the jury instructions in *Arban* wrongly merged the interference theory into the retaliation claim. *See id.* at 816 17 (noting "an apparent flaw in this circuit's FMLA jurisprudence"). *Weimer* does likewise, considering the employee's claim under the FMLA retaliation standard despite designating it an interference claim. *See id.* at 815 19 (approving the district court's use of the retaliation standard and proceeding to consider causation).

Our recent precedential decision in *Donald v. Sybra, Inc.*, authored by a member of this panel, also generally approved the "honest belief" defense in affirming the district

court's grant of summary judgment to the employer. 667 F.3d at 763. But, as a later panel observed, *Donald* did not specify which claim (retaliation or interference) the defense defeated. *See Jaszczyszyn v. Advantage Health Physician Network*, 504 F. App'x 440, 447 49 (6th Cir. 2012) (viewing *Donald* as agnostic regarding whether the "honest belief" rule applies to FMLA interference claims). And the employer's "honest belief" examined in *Donald* that the employee stole from the company, *Donald*, 667 F.3d at 763 was a "legitimate reason *unrelated* to the exercise of FMLA rights for terminating the employee," *id.* at 762 (emphasis added). In any event, *Donald* offers no endorsement of an "honest belief" defense directly related to the exercise of FMLA rights: the employer's belief that the employee misrepresented his medical condition to obtain improper FMLA leave.

We acknowledge that three other circuits allow the "honest belief" defense to interference claims. *See Scruggs v. Carrier Corp.*, 688 F.3d 821, 825 26 (7th Cir. 2012); *Parker v. Verizon Pa., Inc.*, 309 F. App'x 551, 563 (3d Cir. 2009); *Medley v. Polk Co.*, 260 F.3d 1202, 1207 08 (10th Cir. 2001). This line of decisions appears to trace to the Seventh Circuit's decision in *Kariotis v. Navistar International Transportation Corp.*, 131 F.3d 672 (7th Cir.1997). *See Medley*, 260 F.3d at 1208 (referring to *Kariotis* as the "germinal case" for this rule). But that decision not only failed to distinguish between FMLA retaliation and interference claims appearing to address the former, *see Kariotis*, 131 F.3d at 679 81 (distinguishing "discrimination" claims, including the FMLA claim, from the strict-liability

COBRA claim)    but it also rested its "honest belief" ruling on a single regulation: 29 C.F.R. § 825.216(a)'s statement that "An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period." To this, the Third Circuit added 29 U.S.C. § 2614(a)(3)(B)'s likeminded assurance that FMLA's leave provision "shall [not] be construed to entitle any restored employee to . . . any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." *See Parker*, 309 F. App'x at 562. In our view, neither of these provisions support the broad inference these courts (and our concurring colleague) make: that an employer may defeat an interference claim solely on the basis of its honest belief (even if mistaken) that the employee wrongfully claimed FMLA leave.

Today's case does not require us to resolve this thorny issue, however, because Tillman failed to show entitlement to FMLA leave in the first place. *See, e.g.*, *City Mgmt. Corp.*, 43 F.3d at 251 (explaining that an appellate court may affirm on alternative grounds supported by the record). As explained, interference claims require a plaintiff to show that his employer denied FMLA benefits to which he was entitled. *Donald*, 667 F.3d at 761 (citations omitted). For Tillman, that means he needed to qualify for FMLA leave on or about the dates in question. *See, e.g.*, *Clark v. Walgreen Co.*, 424 F. App'x 467, 474 (6th Cir. 2011) (citing *Wysong v. Dow Chem. Co.*, 503 F.2d 441, 447 (6th Cir. 2007)); *Branham*

*v. Gannett Satellite Info. Network, Inc.*, 619 F.3d 563, 568 (6th Cir. 2010). Specifically, he needed to present evidence that he suffered from a "serious health condition that ma[de] [him] unable to perform the functions of [his job]." 29 U.S.C. § 2612(a)(1)(D); 29 C.F.R. § 825.112(a)(4). Importantly, the FMLA predicates leave, and the accompanying entitlement to reinstatement, upon eligible employees "tak[ing] leave . . . for the *intended* purpose of the leave." 29 U.S.C. § 2614(a)(1) (emphasis added).

Both before the district court and on appeal, Ohio Bell advanced an alternative theory for summary judgment on the interference claim: that Plaintiff failed to show entitlement to FMLA leave for the dates in question, March 15 and 28, 2009. (R. 32, SJ Br. at 23 25; Appellee's Br. at 35 40.) To avoid summary judgment, then, the burden shifted to Plaintiff to come forward with evidence presenting a genuine issue of fact regarding his entitlement to FMLA leave. Fed. R. Civ. P. 56(c)(1) (obliging "[a] party asserting that a fact . . . is genuinely disputed [to] support the assertion by . . . citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the absence or presence of a genuine dispute"); *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) ("Once the moving party has met its burden of production, the nonmoving party must 'go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"); *see also Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008) (explaining that

the court "no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact" (citation omitted)). Despite ample notice that Ohio Bell challenged his leave on March 15 and 28, 2009, Tillman offered no evidence supporting these leave requests,[9] arguing instead that Ohio Bell failed to *disprove* his alleged condition. (*See* R. 37, Pl.'s Resp. Br. at 21 27; Appellant's Br. at 27 30; Appellant's Reply Br. at 10 14.) Without that evidence, no genuine issue remained for trial.

Filling this void for Tillman, our concurring colleague points to his medical certifications and argues that their presumptive validity satisfied Tillman's burden. (*See* R. 32-6.) We disagree. Under these circumstances, where the employer promptly presents evidence impugning his leave requests the leave forecasts and surveillance evidence Tillman had a duty to come forward with some evidence showing his entitlement to the leave. *See* 29 U.S.C. § 2614(a)(1) (predicating FMLA leave and reinstatement upon the employee "tak[ing] leave . . . for the intended purpose of the leave"). We may not presume from Tillman's chronic condition and intermittent leave requests that he actually suffered from a serious condition on these specific days. This is especially so with cases concerned with countering, impugning evidence. Otherwise, the medical certification attesting to an intermittent condition could be used as a license to take unnecessary medical

---

[9]Indeed, Tillman's own testimony reflects that he does not recall why he asked for leave on March 15, 2009. (R. 50, Tillman Dep. at 131.)

leave, eliminating the employee's burden of showing entitlement. *Cf.* 29 U.S.C. § 2612(a)(1)(D) (requiring the leave-applicant to demonstrate a "serious health condition that ma[de] [him] unable to perform the functions of [his job]"); *id.* § 2612(b)(1) (allowing intermittent leave for a qualifying (a)(1)(D) health condition "when medically necessary").

Our cases required Tillman to make a showing of entitlement to FMLA leave. Because he failed to do so, the district court did not err in granting Ohio Bell's motion for summary judgment on Plaintiff's FMLA interference claim.

## III. CONCLUSION

For all of the foregoing reasons, the judgment of the district court is AFFIRMED.

**ROSEN, Chief District Judge, concurring.** I agree with and concur in Part II.B of the Majority Opinion, and I join in the Judgment. I write separately on Plaintiff's FMLA interference claim discussed in Part II.C of the Opinion as I find that the district court properly applied the "honest belief rule" to the interference claim in this case where the issue presented was not simply the employee's entitlement to leave under the FMLA, but rather the employee's abuse of his FMLA leave rights. I also disagree with the majority's conclusion that Tillman "failed to show entitlement to FMLA leave in the first place," and, therefore, failed to satisfy the third prong of his *prima facie* case. I believe that this element of the *prima facie* case was satisfied once Tillman submitted to Ohio Bell the medical certification of his doctor establishing that he suffers from a "serious health condition that makes [him] unable to perform the functions of [his job]" and certifying a "medical necessity" for "intermittent [FMLA] leave," and Ohio Bell accepted the certification without questioning it.

I.

Taking the latter point first, in order to establish that an employee requesting leave under the FMLA is qualified for the leave, an employer may require the employee to obtain a medical certification from a health care provider setting forth a description of the employee's medical condition and information certifying the medical necessity for the leave. *See* 29 C.F.R. § 825.306. "The medical certification provided by the employee is presumptively valid if it contains the required information and is signed by the health care provider." *Novak v. Metrohealth Medical Ctr.,* 503 F.3d

32

572, 578 (6th Cir. 2007) (quoting *Harcourt v. Cincinnati Bell Tel. Co.*, 383 F. Supp. 2d 944, 955-56 (S.D. Ohio 2005) (citing 29 C.F.R. § 825.307(a))).

The record in this case reflects that Tillman provided Ohio Bell with a medical certification from his doctor certifying the medical necessity for intermittent leave for his chronic back condition in May 2008. *See* R. 32-6. There is nothing in the record to suggest that Tillman's employer deemed that certification to be inadequate or invalid, or otherwise questioned the doctor's certification that Tillman suffered from a serious health condition which intermittently rendered him unable to perform his job.[10]

After the initial certification, an employer may require subsequent recertifications subject to the restrictions set forth 29 C.F.R. § 825.308. The regulations provide that an employer may not request recertification more frequently than every 30 days. 29 C.F.R. § 825.308(a),(b). However, employers are not so limited and may request recertification more frequently if "[t]he employer receives information that casts doubt upon the continuing validity of the certification." 29 C.F.R. § 825.308(c)(3). "The employer may ask for the same information when obtaining recertification as that permitted for the original certification" and, in addition, "the employer may provide the health care provider with a record of the employee's absence pattern and ask the health care provider if the serious health condition and need for leave is consistent with such a pattern." 29 C.F.R. § 825.308(e). The employer must allow at least 15 days after it requests recertification for the

---

[10]If an employer has a reason to doubt the validity of the certification, it may, at the expense of the employee, require a second medical opinion. 29 U.S.C. § 1613(c)(1).

employee to provide the requested recertification. 29 C.F.R. § 825.308(d). An employer violates the FMLA if it requests medical certification and then terminates the employee before the 15-day period has run. *See Killian v. Yoruzu Auto. Tenn., Inc.*, 454 F.3d 549, 555 (6th Cir. 2006).

In this case, after providing his original certification in May 2008, Tillman provided Ohio Bell with recertifications from his doctor on October 13, 2008 and February 9, 2009. *See* R. 32-6. As with the original certification, there is nothing in the record indicating that Ohio Bell deemed any of the recertifications inadequate or insufficient, and nothing indicates that Tillman's doctor was ever asked to review the pattern of his absences. Furthermore, even though the record indicates that Ohio Bell received information casting doubt upon the continuing validity of the certification after it had received the February 9, 2009 recertification, nothing in the record indicates that Tillman was ever requested to provide any further recertification as provided in the regulations.

Since there is no evidence suggesting that Ohio Bell deemed the February 9, 2009 certification invalid or inadequate and no evidence showing that Tillman was asked to provide any further recertification of his medical condition or the medical necessity for intermittent leave, there is no legal basis for requiring Plaintiff to independently establish that he was qualified for FMLA leave on March 15 and 20, 2009 to satisfy the third prong of *prima facie* case. "A plaintiff's burden in establishing a *prima facie* case is not intended to be an onerous one." *Skrjanc v. Great Lakes Power Serv. Co.,* 272 F.3d 309, 315 (6th Cir. 2001); *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007) ("The burden of proof at the *prima facie* state is minimal....") Plaintiff's submission of the medical certification which showed that he suffered from "a serious health condition that ma[de]

[him] unable to perform the functions of his job" -- and his employer's acceptance of that certification, without objection -- already had established that he was statutorily qualified for the leave.

The very nature of "intermittent leave" under the FMLA is that separate blocks of leave time taken within the intermittent leave period will be "due to a single qualifying reason." *See Roberts v. Ground Handling, Inc.*, 499 F. Supp. 2d 340, 352 (S.D.N.Y. 2007) (quoting 29 C.F.R. § 825.203(a) (2009)). The Act does not require that a plaintiff who has been granted intermittent leave provide additional proof that he had a serious health condition rendering him unable to work every time he takes a day of leave during the covered period. Indeed, to impose on Tillman the additional requirement that he separately establish that he suffered from a serious health condition on two specific dates -- March 15 and 20, 2009 -- as the majority's decision requires, would contravene the statute. *See Harcourt v. Cincinnati Bell Tel. Co.*, 383 F. Supp. 2d at 953 (holding that an employer's recertification requirement more restrictive than the requirements of the FMLA is not enforceable against the employee); *see also Callison v. City of Philadelphia*, 430 F.3d 117, 121 (3rd Cir. 2005) ("[W]here an employer's internal policies conflict with the FMLA, the FMLA controls and the employee need only comply with the requirements of the Act to invoke its protection.").

Tillman complied with the requirements of the Act when he provided Ohio Bell with a medical certification and recertifications which showed that he suffered from "a serious health condition that ma[de] [him] unable to perform the functions of his job," and Ohio Bell never

challenged those certifications. Tillman, therefore, has sufficiently demonstrated satisfaction of the

third prong of a *prima facie* case of FMLA interference.

II.

As the majority acknowledges, the application of the "honest belief" rule to an FMLA

claimant's interference claim presents a closer question, largely because our precedents in this

interesting corner of FMLA law are not a model of clarity, and attempting to discern a clear rule

reveals only that different panels of our Court have produced different answers to this question.

What can be distilled from our precedents, however, is that there appear to be two lines of approach

to interference claims -- one line finding that the employer's intent, or honest belief, is "irrelevant,"

and another finding that, at least where the employer contests entitlement to leave based upon the

employee's purported conduct or activities that undermine his entitlement to leave, the employer may

rely upon its honest belief that the employee is not entitled to leave. Discerning these divergent lines

of precedent requires a close reading of our cases in this area. However, certain basic things are

clear.

First, and foremost, the FMLA does not provide an employee with carte blanche to obtain

proper leave and then abuse that leave. *Weimer v. Honda of America Mfg., Inc.*, 2008 WL 2421648,

at * 4 (S.D. Ohio 2008) (citing *Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 681 (7th

Cir.1997)). This is made clear in the statutory scheme's conditioning of an employee's right to

reinstatement following FMLA leave on the "eligible employee . . . [having] tak[en] leave . . . *for*

36

*the intended purpose of the leave.*" 29 U.S.C. § 2614(a)(1) (emphasis added). Therefore, an employee who initially obtains valid leave for a qualifying reason and whose doctor supports continued leave -- and, thereby, as explained above, meets the qualification prong of the *prima facie* case -- can nonetheless lose the protections of the FMLA when he or she does not use the leave for its intended purpose. *Weimer,* 2008 WL 2421648, at \*4. "'Nothing in the FMLA prevents employers from ensuring that employees who are on leave from work do not abuse their leave.'" *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 284 (6th Cir. 2012) (quoting *Allen v. Butler Cnty. Comm'rs*, 331 F. App'x 389, 395 (6th Cir. 2009)); *Hall v. Ohio Bell Tel. Co.*, 2013 WL 2986991 (6th Cir. June 17, 2013); *Callison v. City of Philadelphia*, 430 F.3d 117, 121 (3rd Cir. 2005).

"[A]n employer's honest suspicion that the employee was not using his medical leave for its intended purpose is enough to defeat the employee's substantive rights FMLA claim." *Crouch v. Whirlpool Corp.,* 447 F.3d 984, 986 (7th Cir. 2006) (citing *Kariotis*, 131 F.3d at 681); *see also Warwas v. City of Plainfield*, 489 F. App'x 585, 588 (3d Cir. 2012) (holding that an employer may defeat an FMLA interference claim if the employment decision "was based upon an honest belief that the plaintiff either misused or failed to use her medical leave for the intended purpose"); see also *Medley v. Polk Co*., 260 F.3d 1202, 1203,1208 (10th Cir.2001) (reversing case for failure to instruct the jury that "an employer who honestly believes that it is discharging an employee for misusing FMLA is not liable even if the employer is mistaken").

Next, I respectfully disagree with the majority's opinion that "honest belief" rule should not be applied in FMLA interference cases because "our interference-claim precedents repeatedly

disclaim consideration of the employer's intent." It is true that in "absolute entitlement" cases where the only issue is whether the employer affirmatively interfered with the employee's use or attempted use of leave to which he or she was unquestionably entitled as a matter of law, the employer's intent is not relevant and the employer's honest belief that it acted in compliance with the law provides no defense. *See e.g., Arban v. West Publ'g Corp.*, 345 F.3d 390, 401 (6rth Cir. 2001) ("Because the issue is the right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer." (citation omitted)); *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 508 (6th Cir. 2006) ("The employer's intent is not a relevant part of the [interference] inquiry under [the FMLA].").  However, as the majority acknowledges, neither *Arban* nor *Edgar* address claims of FMLA abuse.  In interference cases in which the employer honestly believes that the employee is abusing his leave  -- by, for example, misrepresenting his medical condition -- no circuit precedent precludes the employer from asserting this honest belief in its defense.

Furthermore, in *Grace v. USCAR,* 521 F.3d 655, 670 (6th Cir. 2008), we held that the *McDonnell Douglas* burden-shifting framework -- a well-established evidentiary path used to resolve the issue of *intent* in employment discrimination cases -- applied to *both* FMLA retaliation and interference claims. *Grace*, 521 F.3d at  670; *see also Donald v. Sybra, Inc.,* 668 F.3d 757, 762 (6th Cir. 2012); *Romans v. Michigan Dep't of Human Servs.*, 668 F.3d 826, 841 (6th Cir. 2012); *Gates v. United Postal Service*, 2012 WL 4902851 at *4 (6th Cir. Oct. 16, 2012).  And, it is well-settled in our circuit that the honest belief rule can be used by an employer in the *McDonnell Douglas* construct to refute a plaintiff's *prima facie* case.  *See e.g., Smith v. Chrysler Corp.*, 155 F.3d 799,

807 (6th Cir. 1998) (quoting *Peterfield v. TVA*, 941 F.2d 437, 443 (6th Cir. 1991)); *Blizzard v. Marion Technical College*, 698 F.3d 275, 286 (6th Cir. 2012).

Prior Sixth Circuit FMLA decisions simply do not entirely foreclose the application of the "honest belief" rule in all interference cases. To the contrary, as the majority acknowledges, our circuit has applied the "honest belief" rule to at least a certain subset of interference claims. For example, just last year, we determined that the honest belief rule applies in both FMLA retaliation claims and interference claims in *Donald v. Sybra, Inc., supra*, 667 F.3d at 763.[11] *See also Weimer v. Honda of America Mfg., Inc.*, 356 F. App'x 812 (6th Cir. 2009) (approving application of the honest belief defense to an FMLA interference claim); *Adams v. Auto Rail Logistics, Inc.*, 504 F. App'x 453, 457 (6th Cir. 2012) (to defeat the plaintiff's FMLA interference claim, the defendant "need only demonstrate that it believed the plaintiff was misusing the FMLA such that it would have discharged the plaintiff despite any legitimate leave.")

Our decision in *Weimer* provides a good illustration of these principles. In *Weimer*, the plaintiff was granted FMLA leave by his employer, Honda of America, after being diagnosed with a concussion and a muscle strain as a result of a blow to the head. Honda subsequently learned that

---

[11]It is true that, in *Jaszczyszyn v. Advantage Health Physician Network*, 504 F. App'x 440 (6th Cir. 2012), the court declined to read *Donald* as either adopting or rejecting the "honest belief" rule within the context of FMLA interference claims, but this was because, in its view, "that opinion does not address the issue clearly, let alone explicitly." *Id*. at 449. However, the *Jaszczyszyn* court made no affirmative determination that the honest belief rule was inapplicable; rather the court found it unnecessary to deal with the rule because it determined that the record established that the plaintiff "had been given all the leave to which she was entitled." *Id.* The court concluded that Jaszczyszyn's interference claim failed as a matter of law on this alternative ground. *Id.*

Weimer had been seen building a porch on his house when he was supposed to have been incapacitated. Following an investigation, Weimer's employment was terminated for violation of the company's Standards of Conduct which, in relevant part, prohibited "[m]isprepresent[ing] facts or falsify[ing] records or reports, such as personnel records, medical records, leave of absence documentation, inventory counts, quality control reports, etc." *See Weimer*, 356 F. App'x at 814 (first alteration in original). Weimer thereafter brought suit. After the district court denied the parties' cross-motions for summary judgment, the case went to trial and the jury returned a verdict in favor of Honda. *Id.* at 813. Weimer appealed arguing that the district court erred in instructing the jury on the honest-belief defense and pretext. *Id.*

The appellate court first determined that the plaintiff's claim was an entitlement/interference claim, even though counsel would not specify whether the claim in the complaint was an interference or a retaliation claim. *Id.* at 815 ("We therefore conclude that this case is brought pursuant to 29 U.S.C. § 2615(a)(1) for interference and restraint."). Turning to the honest belief rule, the court found no error in presenting the honest belief and pretext instruction to the jury. *Id.* at 818. The court explained that "the FMLA is not a strict-liability statute." *Id.* (citing *Edgar, supra,* 443 F.3d at 507). Because evidence was presented from which the jury could have found that Weimer had lied to company physicians about his medical condition and activities at home while on leave, the jury could have concluded that the employer had a legitimate reason for its actions. *Id.*[12] Significantly, the court

---

[12]The court also determined that "[t]he jury was also able to use such evidence to conclude that Weimer was not entitled to take FMLA leave in the first place because he did not suffer from a serious health condition." 356 F. App'x at 818.

found that the jury was properly instructed that, when considering whether the employer had demonstrated a legitimate reason for its actions, the focus was to be "not so much whether Weimer actually lied, but rather *whether Honda reasonably and honestly believed that Weimer lied*." *Id*. (emphasis added). Finally, the court determined that "[t]here was sufficient evidence for the jury to conclude that Honda reasonably relied on the facts before it at the time its decision to terminate Weimer was made." *Id*. at 819.

Beyond our circuit, although a similar muddle can be seen in some circuits, no circuit has held that the honest belief rule does not apply in interference cases, and at least three other circuits have clearly applied the honest belief doctrine to FMLA interference claims. The Third, Seventh and Tenth Circuits have each held an employer can defend against an FMLA interference claim by showing that it honestly believed the employee did not take FMLA leave for its intended purpose. *See Scruggs v. Carrier Corp*., 688 F.3d 821, 825-26 (7th Cir. 2012); *Vail v. Raybestos Prods. Co.*, 533 F.3d 904, 909 (7th Cir. 2008); *Crouch*, 447 F.3d at 986-87; *Parker v. Verizon Pa.*, *Inc.*, 309 F. App'x 551, 563 (3d Cir. 2009); *Medley v. Polk Co.*, 260 F.3d 1202, 1207-08 (10th Cir. 2001). Further, appellate courts have affirmed the entry of summary judgment in favor of the employer based upon the employer's honest belief that the employee was misusing FMLA leave. *See Scruggs*, 668 F.3d at 826 (employer had honest suspicion that employee was not using his FMLA leave to assist in his mother's care); *Vail*, 533 F.3d at 909-10 (employer had honest belief that employee who had been granted FMLA leave because of her migraine headaches was using her leave to work for her husband's lawn mowing service); *Crouch*, 447 F.3d at 987-88 (employer honestly believed that

the employee was using FMLA leave for vacation purposes instead of recovering from an injured knee); *Parker*, 309 F. App'x at 563 (employer established it had an honest belief that plaintiff had misrepresented his health condition).

In addition to these courts, many district courts --including a number of them within the Sixth Circuit -- have held that the honest belief defense applies to FMLA interference claims. *See e.g., Lineberry v. Richards*, 2013 WL 438689, at *6-7 (E.D. Mich. Feb. 5, 2013); *Reinwald v. Huntington Nat'l Bank*, 684 F. Supp. 2d 975, 984-85 (S.D. Ohio 2010); *Stanley v. Volvo Parts of N. Am.*, 2008 WL 2473658, at *4 (S.D. Ohio June 17, 2008); *Kitts v. General Telephone North, Inc.*, 2005 WL 2277438 at *12-13 (S.D. Ohio Sept. 19 2005); *Stonum v. U.S. Airways, Inc.*, 83 F. Supp. 2d 894, 899-902 (S.D. Ohio 1999); *Casseus v. Verizon N.Y., Inc.*, 702 F. Supp. 2d 326, 336 (E.D.N.Y. 2010); *Nelson v. Oshkosh Truck Corp.*, 2008 WL 4379557, at *4 (E.D. Wis. Sept. 23, 2008); *Brown v. Conopco, Inc.*, 2007 WL 3224586 at *6 (D.Md. Oct. 24, 2007); *Moughari v. Publix Super Markets, Inc.*, 1998 WL 307454 at *2 (N.D. Fla. Apr. 27, 1998), *aff'd without opinion*, 170 F.3d 188 (11th Cir. 1999).

Moreover, to preclude consideration of the employer's honest belief in this case simply makes no sense. We have already concluded that in terminating Plaintiff's employment for fraudulent conduct in violation of the company's Code of Business Conduct, Ohio Bell held an honest belief based on particularized facts that Plaintiff had abused his FMLA leave on March 15 and 28, 2009, and, therefore, Plaintiff could not make out an FMLA retaliatory discharge claim. It would be nonsensical to deny the Defendant the right to rely on its honest belief that Plaintiff was

not using his FMLA leave on those dates for its intended purpose to refute Plaintiff's interference claim that he was "denied FMLA benefits to which he was entitled."

In summary, although our precedent in this area is not pristinely clear, two lines of interference claim analyses emerge: one in which the issue is simply whether the employee is "absolutely entitled" to leave, and the employer makes no claim that it suspects the employee is abusing his leave; and a second line in which an employer shows that it has an honest belief that the employee has abused his leave in some way. In the former cases, an employer's intent is indeed irrelevant because the only question is whether the employee is entitled to leave. In the latter cases, however, the employer's intent is quite relevant.

Viewed in this context, our precedents reflect that the "absolute entitlement" case law is of limited application in cases such as this one, where the issue is not simply the employee's *use* of leave to which he is entitled under the FMLA, but rather his *abuse* of his FMLA leave rights. In interference cases arising under these circumstances, the honest belief rule may be applied. *See e.g., Vail*, 533 F.3d at 909 (characterizing the issue presented in plaintiff's FMLA interference claim as "whether [plaintiff] was abusing her leave or whether Raybestos interfered with her rights" and applying the honest belief rule to resolve this issue); *see also Parker v. Verizon*, 309 F. App'x at 563:

> Parker has not shown that he is entitled to FMLA benefits. . . . Parker was not terminated for his use, but rather his misuse, of medical leave in violation of [the company's] Code of Business Conduct. . . . Regardless of Parker's denial that he actually misrepresented his health condition, Verizon's honest suspicion that Parker misused his leave prevents it from being found liable for violating the FMLA. . . .

*Id.* (citations omitted).

This leaves only the majority's view that last year's *Donald* decision should be read as approving the use of the rule in interference cases only to prove that the employer had "a legitimate reason *unrelated* to the exercise of FMLA rights." *See Donald*, 667 F.3d at 762-63 (emphasis added) (employer entitled to rely on its honest belief that plaintiff was guilty of theft to defeat both plaintiff's FMLA interference and retaliation claims).

The majority's misapprehension of the "unrelated reason" requirement is understandable in light of its history in this circuit. The "unrelated reason" requirement appears to have had its genesis in our circuit's jurisprudence in *Arban v. West Publ. Corp.*, *supra*, where, in affirming the district court's denial of the defendant's motion for a judgment as a matter of law, the appellate court quoted *Gunnell v. Utah Valley State Coll.,* 152 F.3d 1253 (10th Cir. 1998), as authority for holding, without further edification, that "'[a]n employee lawfully may be dismissed, preventing him from exercising his statutory rights to FMLA leave or reinstatement, *but only if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave*.'" *Arban*, 345 F.3d at 401 (quoting *Gunnell*, 152 F.3d at 1262) (emphasis added). But in relying on *Gunnell*, the *Arban* court appears to have ignored the context of the *Gunnell* court's pronouncement. In *Gunnell*, the plaintiff "specifically refused to argue that she was fired because of her FMLA request." 152 F.3d at 1262. It was solely on the basis of the plaintiff's concession that the Tenth Circuit affirmed the district court's grant of summary judgment in favor of the employer on Gunnell's interference claim. *See id.* ("In light of this concession, any reason for terminating Gunnell's employment would not involve

FMLA, and consequently the statute can afford her no relief." *Id.*) The relatedness or unrelatedness

of *the employer's reason* for the employment decision, however, never was an issue in the case.

Although the *Gunnell* excerpt in *Arban* has been repeatedly quoted and rotely relied upon in

subsequent years, our later cases have done nothing to clarify or explain the holding. Then, three

years after *Arban*, the court bolstered the *Arban* court's holding by declaring in *Edgar*, "Both the

statute and the DOL regulation likewise establish that interference with an employee's FMLA rights

does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of

FMLA rights for engaging in the challenged conduct." *Edgar,* 442 F.3d at 508.

Not surprisingly, there is no statutory or regulatory citation for this proposition in *Edgar*

because neither the statute nor the regulations even remotely suggest any such thing.[13] Nonetheless,

---

[13]In *Adams v. Auto Rail Logistics, Inc.*, 504 F. App'x 453, the court appears to have at least attempted to provide the regulatory authority missing in *Edgar* and its progeny. There, as support for the "unrelated reason" rule, the court quoted from a portion of 29 C.F.R. § 825.216(a):

> An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA period. An employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration of employment.

*See Adams*, 504 F. App'x at 456 n.1.

However, the part of the regulation not quoted in *Adams* makes clear that this unrelated reason justification is intended to apply only in limited circumstances. Specifically, it is only when the employee is laid off or his shift has been eliminated while he was on leave, or the employee was hired for a term or project which ended while he was on leave that the employer must demonstrate that the employee "would not otherwise have been employed" at the time reinstatement is requested. 29 C.F.R. § 825.216(a)(1)-(3). Nothing in this regulation even remotely requires that an employer

*Edgar* has since been repeatedly cited and accepted, without limitation, as authority for the proposition that "interference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights." *See, e.g., Grace v. USCAR,* 521 F.3d at 669; *Harris v. Metro. Gov't of Nashville and Davidson Cnty., Tenn.* , 594 F.3d 476, 483 (6th Cir. 2010); *Romans v. Michigan Dep't of Human Servs.*, 668 F.3d at 841; *Mitchell v. Cnty of Wayne*, 337 F. App'x 526, 536 (6th Cir. 2009); *Allen v. Butler Cnty. Comm'rs*, 331 F. App'x 389, 394 (6th Cir. 2009). *Cf.*, *Adams v. Auto Rail Logistics, Inc.*, 504 F. App'x 453. It is out of this quagmire of questionable authority that the "unrelated reason" requirement has emerged. It is time to clear away the brush and finally clarify the matter.

While an "unrelated reason" rule may fit in cases like *Donald* where there is no question or suspicion as to the legitimacy of the plaintiff's request or need for FMLA leave,[14] where, as here, the legitimacy of the employee's taking of FMLA leave itself is at issue, it is unrealistic to require that the employer's reasons for its actions be "unrelated" to the taking of the leave. If that were the case, employers would effectively be precluded from ever taking any adverse action against an employee who fraudulently or dishonestly requests FMLA leave or misuses or abuses FMLA leave because

---

show that its legitimate reason is "unrelated" to the employee's exercise of FMLA rights in all cases.

[14]Though the court in *Donald* noted that there were disputes as to whether the plaintiff's had properly invoked the FMLA when she notified her employer that she was going to be absent, her employer did not question the legitimacy of the reason for the leave: extreme pain following treatment for renal stones. *See Donald*, 607 F.3d at 760-61.

any action necessarily would be related to the taking of leave, and, hence, constitute a violation of the Act.

The incongruity of requiring that an employer's reason be shown to be "unrelated" to the exercise of FMLA rights in order to permit application of the "honest belief" rule is demonstrated in cases where the evidence shows that the employee's abuse of FMLA leave constitutes a violation of an employment rule or "code of conduct." In an attempt to adhere to the "unrelated" requirement in such cases, courts focus on the violation of the work rules. *See e.g., Parker v. Verizon*, *supra* 309 F. App'x 551 (granting summary judgment in favor of the defendant employer where the employer demonstrated that the plaintiff was terminated for violating the company Code of Business Conduct by misusing FMLA medical leave); *Warwas v. City of Plainfield*, *supra*, 484 F. App'x at 588 (holding that where employer had a Shop Rule providing that it had just cause to terminate employees for falsification of personnel or any other company form, the defendant's "honest belief that [the plaintiff] had violated company policy by fraudulently obtaining disability leave" foreclosed the plaintiff's FMLA claim and entitled the defendant to summary judgment).

We similarly focused on the violation of a work rule in *Weimer, supra*. In that abuse of leave case, we rejected the plaintiff's argument that the jury was improperly instructed pursuant to instructions approved in *Arban* because the reason given by Honda for Weimer's discharge -- making misrepresentations concerning his FMLA leave in contravention of the company's Associate

47

Standards of Conduct[15] -- was "inextricably intertwined with the exercise of FMLA rights,"

whereas in *Arban*, the defendant-employer alleged that the plaintiff was discharged for

reasons "totally separate from his taking of FMLA leave," i.e, for misrepresenting a

preexisting account as new sales activity in violation of company policy, for engaging in

improper account name-switching, and for other acts of gross negligence, fraud, deceit and

lack of moral character. 356 F. App'x at 816. We categorically rejected Weimer's argument

stating:

> The legal analysis is not changed in this case because the reason given for Weimer's discharge is that he lied about his medical symptoms and the activities he engaged in while on leave. Ultimately, the jury was called upon to decide whether Honda terminated Weimer for violating its Standards of Conduct by lying, or whether Honda terminated Weimer for exercising his FMLA rights by taking FMLA leave. ***The specific subject of Weimer's alleged misrepresentation is not relevant.***

*Id.* (emphasis added).

We treated the employer's reason for discharging the employee similarly in *Adams v. Auto

Rail Logistics, Inc.*, *supra*. In that case, the plaintiff had requested FMLA leave to care for his sick

daughter. Although the plaintiff admitted that he no longer needed to care for his daughter after

December 26, 2007, he did not return to work until January 8, 2008. Based upon its belief that

Adams had misused these 15 days of leave time, Auto Rail terminated his employment for "fraud

---

[15]*See Weimer*, 2008 WL 2421648.

and dishonesty." 504 F. App'x at 455. A trial was subsequently held and the jury found in favor of the employer.

On appeal, Adams argued that for "fraud and dishonesty" to constitute a qualifying "unrelated" reason defense, the defendant had to prove that he committed fraud and satisfy the elements of fraud under state law. The court rejected that argument:

> Fraud and dishonesty are ... lawful bases for termination. However, the defendant is not required to prove the elements of fraud under state law. It need only demonstrate that it believed that the plaintiff was misusing the FMLA such that it would have discharged the plaintiff despite any legitimate FMLA leave.

*Id.* at 457 (citation omitted).

In each of the above cases, the honest belief rule was applied. It would be disingenuous to say that application of the honest belief rule was permitted in these cases because the violation of a work rule was the reason for the employer's action, and hence, was a "legitimate reason *unrelated* to the exercise of FMLA rights." As is evident from the foregoing discussion, no matter how forcefully courts might insist to the contrary, it is inescapable that in cases such as those discussed above, a violation of a work rule -- and hence, a termination of employment or other adverse employment action taken as a result of that violation -- is *not* unrelated to the taking of FMLA leave. If the honest belief rule may be used in cases involving a work rule violation arising out of abuse or misuse of FMLA leave, there is no logical reason why the underlying abuse itself should be treated any differently.

49

The case before us makes this very clear, and I would find that the district court properly applied the "honest belief" rule to Plaintiff's FMLA interference claim and properly granted Defendant's motion for summary judgment on that claim based upon application of the rule. The record reflects that Ohio Bell made a reasonably informed and considered decision based upon the particularized facts before it at the time. Ohio Bell's FMLA Department Manager, Mary Glass, testified that the decision to deny Tillman FMLA leave for his absences from work on March 15 and 28, 2009 was based on the surveillance tapes and the private investigator's report, Tillman's statements in Patrick McCreary's interview, Dr. Conibear's report, Tillman's e-mail to his supervisor indicating he would take FMLA leave on December 13 if he got assigned to the night shift, and his pattern of using FMLA days on weekends or combined with his days off and holidays to extend his time away from work. [*See* R. 32, SJ Ex. H, Glass Dep. pp. 65-66.] This evidence provided sufficient particularized facts to support a reasonable belief that Plaintiff had abused his FMLA leave on March 15 and 28, 2009, and Plaintiff has failed to produce evidence to raise a genuine issue of material fact as to the reasonableness of Defendant's reliance on those particularized facts or to otherwise establish that his employer did not honestly believe that he had abused his FMLA leave. I would, therefore, affirm the district court's decision granting the defendant's motion for summary judgment on Plaintiff's FMLA interference claim on this basis.

With respect to Plaintiff's FMLA retaliation claim, I join in the majority opinion. More generally, I agree that the district court's judgment in favor of the Defendant should be affirmed.